UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 07-29-P-S |
| | ) | |
| HALVOR CARL, | ) | |
| | ) | |
| Defendant | ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Halvor Carl, charged with aiding and abetting three robberies, in violation of 18 U.S.C. §§ 1951(a) and 1951(2), and distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1), Indictment (Docket No. 1), Counts One and Four-Six, moves to suppress statements made on November 6, 2004.[1]  An evidentiary hearing was held before me on September 5, 2007 at which the defendant appeared with counsel.  Four exhibits were offered by the government and admitted without objection.  Four witnesses testified.  I now recommend that the following findings of fact be adopted and that the motion be denied.

### I. Proposed Findings of Fact

David W. Dumond, a colonel in the York County Sheriff's Office with almost 22 years of experience in law enforcement, in November 2004 commanded that office's tactical force.  On November 5, 2004 he was called in as a result of an investigation by Detective Mike Hayes of that office.  Hayes was investigating a robbery in Hollis, Maine and had identified some suspects in that

---

[1] The defendant also moved to suppress any physical evidence obtained during a search of his residence at 23 Proprietors Lane in Buxton, Maine pursuant to a search warrant on November 6, 2004.  Motion to Suppress, etc. ("Motion") (Docket No. 66) at [5]-[6]. The government represented in its written opposition and at the hearing on the motion that it would not offer any such evidence against (*continued on next page*)

crime, Bryan Black and Timothy Riley, one of whom had been armed with a handgun. Hayes obtained a search warrant for the defendant's residence at 23 Proprietors Lane in Buxton, Maine and for the arrest of Black. Dumond's tactical unit was called upon to execute the warrant because a round had been fired during the robbery. Officers from the towns of Buxton and Gorham and the Cumberland County Sheriff's Office also participated in executing the warrant.

    The officers initially believed that only Black and the defendant were inside the residence and planned a "dynamic" entry due to Black's criminal history and the nature of the evidence they expected to find inside, making it advisable to take the occupants by surprise. However, observation of the residence showed that a number of people were moving in and out of the mobile home so the officers decided to set up inner and outer perimeters around the home and to call the occupants by telephone to inform them that a search warrant was going to be executed and to allow them the option to leave the home voluntarily. At some time between midnight and one a.m. the call was placed. The defendant answered the telephone and, among other things, told the police that Black was not in the home. No one was allowed to leave the area enclosed by the inner perimeter without an escorting police officer. The officers had been instructed not to question anyone who had been in the home at the time of the call and not to search them for weapons other than those that were in plain view.

    Three people came out of the home: the defendant, his minor daughter, and a man later identified as Darren Frateroli. The officers knew that other people remained in the home. The officers were dealing with unknown individuals in the dark, and the door of the home had been left open, so they needed to establish control over each person who left the home. The defendant and his daughter obeyed verbal instructions to kneel, after which they were approached from behind by a "take-down" team and handcuffed, then escorted away to a command post that had been set up at the

---

the defendant on these charges and accordingly that portion of the defendant's motion is moot. Counsel for the defendant is reminded (*continued on next page*)

intersection of Proprietors Lane and another street, less than a mile from the home. Only one member of the take-down team was carrying a weapon, most likely an M-4 rifle. The defendant might have been able to see part of Dumond's body as the defendant stood outside the home. Dumond's weapon was slung across his body, not in firing or "ready" position, which is a position in which the weapon's barrel is pointing down but may quickly be brought up into firing position. Frateroli initially was boisterous and uncooperative; it took the officers some time to get him to go to his knees, after which he was placed in flex cuffs, which are a loop of plastic or nylon that is tightened by tying.

      Donald Foss, a detective lieutenant with the Cumberland County Sheriff's Office who has 15 years' experience in law enforcement, had been assisting for the two weeks before November 6, 2004 in the investigation of a rash of armed robberies and burglaries in Cumberland and York counties. His role in the execution of the search warrant was to assist in shuttling people who were removed from the residence away from the residence and to interview them. He waited at a school about 200 feet from the command post, on the other side of an athletic field, along with Detective Paul Thorpe, as the search began. He and Thorpe were asked to pick up a subject beyond the command post; Thorpe drove there without using the headlights on his white unmarked police car. Foss saw a man and a juvenile female standing beside the road with at least one member of the tactical team. The man was Frateroli, who was patted down by Foss and placed in the front seat of the police car. Foss and Thorpe transported Frateroli to the command post and left him there. They then drove back toward the mobile home and saw the defendant standing with another tactical team member. Foss patted the defendant down and asked his name. The defendant gave Foss his name and then asked Foss why the police were not arresting the real robbers. Foss asked who that was — the only time he asked the defendant a question — and the defendant replied, "Bryan and Timothy." The defendant said that

---

that this court's local rules require that the pages of all motions and memoranda of law be numbered at the bottom. Local Rule 147(e).

Bryan Black was hiding in his house and that Timothy Riley was in a motel with his girlfriend and that Riley would not come to the defendant's house because the defendant would "beat his ass." *See also* Government Exh. 1 at [2]. Taking these volunteered statements as an indication that the defendant was willing to talk with the police, Foss told Hayes when delivering the defendant to the command post that the defendant might want to cooperate. Hayes told Foss that he had spoken with the defendant's daughter, the juvenile female, and that she had confirmed that Mary Lou Frisko, the defendant's live-in girlfriend, was at the Sunrise Motel with Riley.

      Dana Thompson, a detective with the Gorham Police Department with more than 14 years' experience in law enforcement, was also assigned to shuttle people who left the mobile home back to the staging area at the school on the night of November 5-6, 2004. Michael Coffin, another Gorham police officer with 8 years' experience, was with him. They were called to pick up an adult male. They drove in their unmarked police cruiser to the command post, or shortly beyond it, without headlights.[2] Thompson saw the defendant standing with Foss waiting to be picked up. The defendant was in handcuffs. Foss told Thompson that the defendant wanted to cooperate and tell what he knew about Riley and Black. Thompson patted the defendant down and the defendant then rode in the back seat of the unmarked cruiser to the school. When they arrived at the school, the defendant's handcuffs were removed and he was allowed to speak with his daughter. He was given privacy to speak with his daughter as long as he wished. He had expressed concern about his daughter's safety. He arranged for someone to pick her up at the school. Then the defendant rode, again in the back seat of the cruiser, to the Buxton police station with Thompson and Coffin. The defendant got into and out of

---

[2] Thompson testified that he and Coffin did not stop at the command post and drove the defendant from a point on the road between the command post and the mobile home directly to the school. I find the testimony of Dumond in general and Foss and Coffin in particular that the defendant was transferred to Thompson at the command post to be accurate on this point.

the cruiser on this own.  Thompson does not remember any conversation with the defendant during this trip of fewer than 10 minutes' duration.

At the Buxton police station the defendant, Thompson and Coffin went into a room that contained two desks and some filing cabinets. The room had a window.  Thompson put a tape recorder on one desk and told the defendant that he would be recording the interview.  He then went over a *Miranda*[3] form with defendant, who stated that he understood each of his rights.  The defendant signed a waiver of these rights at approximately 1:30 a.m.  Government Exh. 2.  He was questioned for about an hour, during which he never asked to leave.  The defendant would have been allowed to leave if he had asked to do so.  He was cooperative throughout the interview.  His responses did not seem slow to Thompson.  He did not seem confused.

## II.  Discussion

The defendant contends that "[t]he fact that [his] home was invaded by a tactical team, he was arrested, had an extensive conversation about his involvement prior to Miranda, and that Miranda was delayed makes any statements or any waiver involuntary."  Motion at [7].  At the hearing, his attorney also argued that a statement by Thompson during the interview proved that he had engaged in "conversation" with the defendant before the *Miranda* warning was given, making the waiver that preceded the interview at the Buxton police station invalid.  That statement is the following: "On the way down here we weren't talking because I hadn't read you your rights but you mentioned Domino's in Westbrook."  Criminal Investigation Division [Transcript] (Government Exh. 3) at 9.  First, this statement does not indicate that Thompson or Coffin asked the defendant any questions during the transport from the school to the police station.  The statement could refer to information volunteered by the defendant during the transport, before the transport or after the transport as the three walked from

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

5

the cruiser into the police station. Second, the defendant clearly was not in custody at any point after the handcuffs were taken off when these three first reached the school. *See United States v. Mittel-Carey*, 493 F.3d 36, 39 (1st Cir. 2007) (factors to consider when custody at issue include whether suspect questioned in familiar or at least neutral surroundings, number of officers present, degree of physical restraint and duration and character of questioning). If the defendant was not in custody, no statement of *Miranda* rights and warnings was required even if one of the officers directly elicited the information that the defendant knew something about Domino's in Westbrook. *See United States v. Abrams,* 2004 WL 180380 (D. Me. Jan. 29, 2004) at *6. Finally, nothing in that statement even suggests that the defendant's mention of Domino's, whenever it occurred, was coerced in any way. Thompson's statement provides no basis on which to invalidate the statement of *Miranda* rights and warnings, if indeed such a statement was required.

The defendant similarly was not in custody at the Buxton police station. He was told that he could stop answering questions at any time. Transcript at 2.[4] He had not been handcuffed since he arrived at the school. He got into the cruiser on his own in order to travel to the police station. The questioning at the police station was not accusatory or confrontational. *See generally United States v. McCarty*, 475 F.3d 39, 45-46 (1st Cir. 2007). Since the defendant was not in custody, no *Miranda* statement was required before the interview at the police station. Even if the defendant had been in custody at that time, however, the defendant's waiver was knowing and voluntary and accordingly none of the statements he made during that interview need be suppressed.

---

[4] At the hearing, counsel for the defendant stated that he did not contest the accuracy of the transcript of the interview but that the transcript does not accurately show what happened or how the defendant's responses unfolded in real time. The government in response offered a CD of the tape recording itself. Nothing on that recording suggests anything about what happened during the interview or how the defendant's responses unfolded that causes me to doubt in any way the conclusions that I reach in this recommended decision.

Remaining for consideration are the statements made by the defendant to Foss while awaiting transport to the school. At the hearing, the government conceded that the defendant was in custody when these statements were made.[5] The inquiry then becomes whether the statements made by the defendant at this time were incriminating or were volunteered. "The Fifth Amendment does not bar the admission of volunteered statements." *United States v. Montgomery*, 714 F.2d 201, 202 (1st Cir, 1983). Here, all of the defendant's statements except his direct answer to Foss's question — "Bryan and Timothy" — were volunteered  The defendant's initial question — "Why aren't you arresting the real robbers?" — was incriminating only if any statement by a witness identifying the perpetrator of a crime or denying the witness's own culpability may fairly be characterized as incriminating. That is too broad a definition of the term. In any event, the defendant's initial question clearly was volunteered, not elicited by Foss or any other law enforcement officer, and accordingly it may not be suppressed. Foss's single question in response to the defendant's initial question renders the defendant's response to that question, and, arguably, the other statements that followed before the defendant was transferred to the school, inadmissible only if the question constituted interrogation, that is, if Foss should have known that his question was reasonably likely to elicit an incriminating response. *McCarty*, 475 F.3d at 45. In this case, Foss was asking for what may perhaps be characterized as exculpatory information, the identity of the individuals whom the defendant thought or knew to be the "real robbers." The question may not fairly be characterized as reasonably likely to elicit incriminating information. *See generally United States v. Genao*, 281 F.3d 305, 310-11 (1st Cir. 2002). Even if any of the information volunteered by the defendant on this occasion was

---

[5] Foss testified that the defendant asked him, "Why aren't you arresting the real robbers?," he then asked the defendant who that was, the defendant answered "Bryan and Timothy" and the defendant went on to say that Bryan Black was then hiding in the defendant's residence, that Timothy Riley was then at the Sunrise Motel with the defendant's girlfriend, that Timothy had "the gun," and that Timothy would not come to the defendant's house because if he did the defendant would "beat his ass."

incriminating, it cannot be said that Foss's question was designed or even reasonably likely to elicit incriminating information.

## Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress statements he made on November 6, 2004 be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 11th day of September, 2007.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge